## UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION

IRWIN TRIPP,

        Plaintiff,

v.                                       Case No: 8:21-cv-510-WFJ-SPF

WALMART, INC. and WAL-MART STORES EAST, L.P.,

        Defendants.

_____/

## <u>ORDER</u>

Before the Court is Plaintiff Irwin Tripp's Motion for Sanctions (Dkt. 78). Defendants Walmart, Inc. and Wal-Mart Stores East, L.P. have responded in opposition (Dkt. 122), and Plaintiff has not replied. Upon careful review, the Court grants-in-part and denies-in-part Plaintiff's motion.

## BACKGROUND

### I.    The Accident

On May 29, 2019, Defendants hired Plaintiff (an independent contractor) to deliver a load of goods to the Walmart distribution center located at 5600 Lucerne Park Road, Winter Haven, Florida (the "Distribution Center"). Dkt. 64 at 4. Plaintiff arrived at the Distribution Center the next morning, backed into Bay 54, and went through the process of securing and unhooking his trailer. *Id.* at 5–6.

1

After completing the docking process, Plaintiff exited his tractor cab and walked to the Distribution Center's Central Receiving Office (the "Office") to exchange paperwork. Dkt. 107-1 at 84–85. He then returned to his tractor cab in Bay 54. *Id*. Plaintiff waited there for further instruction. *Id*.

Eventually, Plaintiff received a call from an employee in the Office. *Id.* at 89; Dkt. 64 at 6. The employee instructed Plaintiff to head back to the Office for another exchange of paperwork. Dkt. 64 at 6; Dkt. 107-1 at 89. Plaintiff opened his tractor cab door, stepped down backwards into the demarcated zone between Bay 54 and Bay 55, and turned around to verify that his delivery had been unloaded. Dkt. 107-1 at 112.

At the same time, Joshua Binnion (Defendants' employee) was operating Terminal Tractor unit M0007 ("M0007") with an attached trailer. As Mr. Binnion backed into Bay 55, he felt a "jolt." Dkt. 81 at 61. Unsure what had happened, Mr. Binnion stopped M0007, threw it in neutral, and popped his brakes. *Id.* at 62. When Mr. Binnion got out, it became apparent that he had hit and dragged Plaintiff with M0007's attached trailer. *Id.*

Fortunately, Plaintiff survived. He nevertheless sustained catastrophic injuries requiring prolonged hospitalization. Dkt. 107-1 at 170. Plaintiff is currently confined to a wheelchair, as both of his lower limbs were lost due to the incident. Dkt. 80 at 168.

## II.     Defendants' Handling of Evidence

Defendants' corporate counsel arrived on scene with an investigation and evidence preservation team approximately four to five hours after the accident. Dkt. 85 at 104; Dkt. 82 at 66–68. At this point, Kenneth Smith (the Distribution Center's General Manager) directed John Jones (the Distribution Center's Operations Manager) "to lock the tractor and trailer out, put it in a secure location, [and] make sure it couldn't be accessed or used." Dkt. 85 at 107. Defendants' "lock out" procedure usually involves putting a cable and lock on the subject equipment before locking the keys to the equipment in a safe box. Dkt. 86 at 34–35. According to Michael Johnson (a maintenance employee at the Distribution Center), "[i]f any yard truck has been in an accident, it's locked down automatically" and no maintenance would be done on it without a manager's approval. *Id.* at 35–36.

Notwithstanding, on May 31, 2019, only one day after the accident, Mr. Johnson got approval to replace M0007's rear taillights. *Id.* at 98. On June 20, 2019, third-party vendor On-Site Fleet Services of Florida ("On-Site") replaced M0007's brakes, seven-way electrical pigtail cord ends,[1] and water temperature gauge. Dkt. 138-11 at 16–17. On-Site also performed preventative maintenance on M0007 and adjusted a rear door. *Id.*

---

[1] A tractor's pigtail is a fixed electrical cord that connects the back of a tractor to the front of an attached trailer. The pigtail supplies power to the trailer and is responsible for activating the trailer's backing lights, brake lights, and signal lights. Dkt. 83 at 38–39; Dkt. 82 at 31.

On June 24, 2019, Defendants acknowledged receipt of Plaintiff's "Request for Vehicles Inspection Evidence Preservation Notice/ Spoliation Letter" (the "Letter").[2] Dkts. 100 & 101. Plaintiff's Letter directed Defendants to "preserve all evidence, documents, records, or other data, whether in paper or electronic form, regarding [Plaintiff's accident]." Dkt. 100 at 2. In addition, Plaintiff's Letter specifically requested that Defendant preserve "the vehicles involved in [Plaintiff's accident,] . . . [a]ny and all videos, surveillance tapes and backup tapes located on the premises[,] the vehicles involved[,] or the area where the accident/incident occurred . . . [and] [c]opies of the complete maintenance, inspection and repair records or work orders on the vehicles involved in [Plaintiff's] accident for the day of the [accident] and the [six] months prior[.]" *Id.* at 2–5.

Only one day later, on June 25, 2019, M0007 was serviced again for continuing hazard light and bushing issues. Dkt. 103 at 112. At some point, M0007's "Form 118"—a pre-operation checklist that documented, among other things, the condition of M0007's brakes and lights prior to Plaintiff's accident—was lost. In addition, despite Mr. Smith testifying that "there would have to be video of [Mr. Binnion] traveling around the yard" in the surveillance footage Mr. Smith reviewed

---

[2] Plaintiff sent the Letter on June 11, 2019. According to Plaintiff, the Letter was delivered on June 14, 2019. Dkt. 78 at 7.

and allegedly sent to Defendants' counsel on the day of Plaintiff's accident, all video has since been lost. Dkt. 85 at 53–54.

On August 9, 2019, Plaintiff performed an inspection of both the Distribution Center and M0007. When Andrew Cherepon (Plaintiff's expert) inquired about whether any work or repairs had been done to M0007 following Plaintiff's accident, Defendants indicated that nothing had been done. Dkt. 83 at 42. Plaintiff found M0007 under cable and lock. *Id.*

Plaintiff learned of M0007's post-accident maintenance and Defendants' failure to preserve other evidence around two years later during discovery. Dkt. 78 at 8–9. Mr. Cherepon consequently returned to the Distribution Center in September 2021 to further inspect M0007. Dkt. 83 at 42. By this point, M0007 had been back in service for a significant time and had received multiple rounds of maintenance.

## III.   Plaintiff's Motion for Sanctions

On September 14, 2022, Plaintiff filed its Motion for Sanctions for Failure to Preserve Evidence. Dkt. 78. "Plaintiff requests this Court (1) (a) enter default judgment against Walmart as to Counts II and III of the Third Amended Complaint or, (b) alternatively, provide a jury instruction which deems the negligent maintenance of the yard truck a cause of the accident; (2) strike the expert testimony of Walmart's accident reconstruction expert, Donald Fournier; (3) charge attorneys' fees and costs against Walmart for the hours and resources Plaintiff has expended

unraveling the extent of the spoliation and in bringing this Motion; and (4) order any other sanctions or relief this Court deems appropriate. *Id.* at 1–2."

## LEGAL STANDARD

"[F]ederal law governs the imposition of sanctions for failure to preserve evidence in a diversity suit." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). If a failure to preserve electronically stored information is at issue, Federal Rule of Civil Procedure 37(e) controls. *Hyundai Motor Am. Corp. v. N. Am. Auto. Servs., Inc.*, No. 20-82102-CIV, 2021 WL 3111191, at *5 n.2 (S.D. Fla. July 22, 2021).[3] If a failure to preserve tangible evidence is at issue, Eleventh Circuit common law controls. *Id.* at 6.

Rule 37(e) provides that:

[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice;[4] or
(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

---

[3] *See also Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2018 WL 6335178, at *8–9 (S.D. Fla. Dec. 4, 2018) (discussing the reception of Rule 37(e)'s amendment in the Eleventh Circuit).
[4] The Advisory Committee has explained that Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or another." Fed. R. Civ. P. 37(e) Advisory Committee's Notes to 2015 Amendment. "Once a finding of prejudice is made[,]" however, "care must be taken . . . to ensure that curative measures under [Rule 37(e)(1)] do not have the effect of measures that are permitted under [Rule 37(e)(2).]" *Id.* Even so, "it may be appropriate to exclude a specific item of evidence to offset prejudice caused by failure to preserve other evidence that might contradict the excluded item of evidence." *Id.*

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.[5]

Fed. R. Civ. P. 37(e).

Eleventh Circuit caselaw provides that, to establish spoliation of tangible evidence, the movant bears the burden of proving "three foundational elements: (1) that the missing evidence existed at one time; (2) that the alleged spoliator had a duty to preserve the evidence; and (3) that the evidence was crucial to the movant being able to prove its prima facie case or defense." *Hyundai Motor Am. Corp*, 2021 WL 3111191, at *6. (citations omitted). Once a movant establishes these elements, he or she must then prove that the absence of the evidence is predicated on "bad faith." *Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010) (citing *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)).

While the Eleventh Circuit "does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009). In other words, within the context of spoliation, "bad faith is defined by

---

[5] The Advisory Committee has further explained that Rule 37(e)(2) "does not include a requirement that the court find prejudice to the party deprived of the information." Fed. R. Civ. P. 37(e) Advisory Committee's Notes to 2015 Amendment. Additionally, "[f]inding an intent to deprive another party of the lost information's use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2)." *Id.* "The remedy should fit the wrong[.]" *Id.*

culpability and resulting prejudice." *Austrum v. Fed. Cleaning Contractors, Inc.*, 149 F. Supp. 3d 1343, 1350–51 (S.D. Fla. 2016). Such culpability can be shown circumstantially where:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue; (2) the spoliating party took an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Hyundai Motor Am. Corp*, 2021 WL 3111191, at *7 (citation omitted). In addition, courts often consider whether the subject evidence was disposed of pursuant to policy as well as the reasonableness of an alleged spoliator's actions in light of the claim at issue. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1186 (11th Cir. 2020).

If a movant carries his or her burden, "[a] district court has broad discretion to impose spoliation sanctions[.]" *Flury*, 427 F.3d at 944. Possible spoliation sanctions include "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation which raises a presumption against the spoliator." *Id.* at 945. That said, "[d]ismissal represents the most severe sanction available to a federal court, and therefore should only be exercised where there is a showing of bad faith and where lesser sanctions will not suffice." *Id.* at 944.

## DISCUSSION

Plaintiff's Motion for Sanctions focuses on Defendants' alleged spoliation of M0007, M0007's Form 118 (hereafter "Form 118"), and the surveillance video referenced by Mr. Smith. Dkt. 78 at 11–24. The Court will address each in turn.

## I.     M0007

Because M0007 constitutes tangible evidence, Plaintiff must first show: (1) that M0007 once existed in its May 30, 2019, condition; (2) that Defendants had a duty to preserve M0007 in its May 30, 2019, condition; and (3) that this evidence is crucial to Plaintiff's ability to prove his prima facie case. *See Hyundai Motor Am. Corp,* 2021 WL 3111191, at *6. There is no dispute concerning Plaintiff's satisfaction of the first two factors, as Defendants admit that M0007 should have been fully preserved. Dkt. 122 at 10. Defendants nevertheless argue that M0007's original condition is not crucial to Plaintiff's case. *Id.* at 13.

Courts have considered evidence "crucial" where it "would play a central role . . . in any ensuing lawsuit." *Hyundai Motor Am. Corp,* 2021 WL 3111191, at *9; *see also Penick v. Harbor Freight Tools, USA, Inc.*, 481 F. Supp. 3d 1286, 1293 (S.D. Fla. 2020) (finding evidence crucial where it was "not the only evidence that could corroborate or refute [the plaintiff's] allegations . . . [but was] one of the main pieces of evidence that could be used to help resolve the underlying matters in . . . the case"). Evidence will not play a central or outcome determinative role where it is cumulative or otherwise unnecessary. *See Floeter v. City of Orlando*, No. 605-

CV-400-ORL-22-KRS, 2007 WL 486633, at *6 (M.D. Fla. Feb. 9, 2007) (finding email evidence to be relevant but not crucial where the trier of fact did not need to see the emails in order to understand their content due to witness deposition testimony); *see also Wilson v. Wal-Mart Stores, Inc.*, No. 5:07-CV-394-OC-10-GRJ, 2008 WL 4642596, at *3 (M.D. Fla. Oct. 17, 2008) (finding that a memo was not critical evidence because the details of the memo were unnecessary in light of deposition testimony and witnesses who saw the memo). Within the context of negligence claims that are contingent on the condition of a vehicle, the subject vehicle's specific condition is often considered necessary and noncumulative unless its evidentiary value is otherwise preserved. *Flury*, 427 F.3d at 946 (finding "direct examination of the vehicle's condition . . . critically important" where the defendant lost the opportunity to test the plaintiff's theory that the airbag was defective); *see also Graff v. Baja Marine Corp.*, 310 F. App'x 298, 302 (11th Cir. 2009) (finding that a boat's gimbal housing was critical evidence where the plaintiff maintained that a defect in the gimbal housing caused the accident and the defendant could not test it due to the plaintiff's spoliation).

In view of this caselaw, M0007's May 30, 2019, condition represents crucial evidence for Plaintiff's case. Plaintiff has brought two direct liability claims against Defendants: (Count II) negligent failure to maintain M0007, and (Count III)

negligent entrustment of M0007.[6] Plaintiff seeks to show that M0007's allegedly defective lights and alarms causally contributed to the accident by failing to give him the opportunity to sense Mr. Binnion before impact. In addition, Plaintiff seeks to show that M0007's allegedly defective brakes aggravated his injuries by lengthening the time between M0007's impact and M0007 fully stopping after impact. Plaintiff's case therefore largely turns on the condition of M0007's lights, alarms, electrical systems, and brakes at the time of the accident. This is not to mention the relevance this evidence bears in relation to Defendants' argument that Plaintiff is primarily responsible for his injuries through his own negligence. Dkt. 65 at 6–8; Dkt. 122 at 10. As a result, Plaintiff's ability both to prove his claims and disprove Defendants' affirmative defense is greatly diminished by Defendants' failure to preserve M0007.

The mechanical records Defendant produced during discovery do not transform a proper inspection of M0007 into cumulative or unnecessary evidence. While the records do indicate a number of issues with M0007's lights, electrical pigtail, and brakes, they are inconclusive regarding the specific condition of these

---

[6] Defendants argue that Plaintiff's spoliation arguments concerning Counts II (failure to maintain) and III (negligent entrustment) of Plaintiff's Third Amended Complaint (Dkt. 64) are irrelevant in light of Defendants' Motion for Partial Summary Judgment (Dkt. 105). Dkt. 122 at 8. The Court has already ruled that summary judgment disposition of Counts II and III is inappropriate. Dkt. 153 at 11. As a result, Counts II and III will inform the Court's analysis herein.

features. Further, no replaced parts were preserved or otherwise documented by the mechanics who worked on M0007. Dkt. 90 at 26.

This detailed evidence is important for a number of reasons. First, the specific functionality of M0007's pigtail sheds light on Defendants' direct negligence because Plaintiff alleges that, even if Mr. Binnion plugged the pigtail in on the day of the accident, it would not have worked. Hence, due to Defendants' allegedly negligent maintenance, there would be no way that the signal or brake lights would have functioned so as to provide Plaintiff with the sensory data needed to avoid being struck. Second, evidence concerning the specific functionality of M0007's brakes could provide Plaintiff a valuable tool with which to rebut Defendants' expert accident reconstructionists' data and calculations. Third, because Defendants were the only ones who could inspect M0007 before it was serviced, Plaintiff is deprived of any possible evidence that could be used to rebut Defendants' claim that the backup alarm was properly functioning on May 30, 2019.

In sum, this is a highly fact-specific case that centers around M0007. The most dispositive evidence could only have been gathered by inspecting M0007 in its preserved state. Defendants' acts and omissions made it impossible for Plaintiff to do so. And a collection of one-line mechanic notes on invoices sent from On-Site to Defendants after the fact cannot be considered comparable evidence, nor can it alleviate the prejudice suffered by Plaintiff.

All the same, sanctions are only appropriate where such spoliation is predicated on bad faith. *Mann*, 588 F.3d at 1310. Defendants claim that they do not know why M0007 was taken out of "lock out." Dkt. 122 at 10. "Somehow that directive was ignored, and it was repaired and serviced by [Defendants'] outside independent service entity." *Id.* at 11. Ultimately, "[Defendants] [have] been unable to determine why or how [M0007] was repaired and serviced." *Id.* at 12.

The Court finds that "[t]he inexplicable failure by a large, sophisticated corporation" like Walmart to ensure compliance with its own policies in clear anticipation of litigation is not merely negligent. *See Hyundai Motor Am. Corp,* 2021 WL 3111191, at *10. It is bad faith. First, there is no dispute that M0007 once existed in its May 30, 2019, condition or that Defendants knew M0007 constituted material evidence for Plaintiff's future case. Defendants' corporate counsel and investigation team were on scene inspecting M0007 within hours of the accident. Second, according to the deposition testimony of Thomas Willis (an employee of On-Site), any repairs undertaken by On-Site require Defendants to make an affirmative request. Dkt. 90 at 15, 18, 24. Defendants made this request, presumably through an employee at the Distribution Center, while knowing that they had a duty to preserve M0007.

More importantly, Defendants' spoliation cannot be explained as not involving bad faith in the form of reckless disregard for its obligation to preserve

M0007. *See United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 259 (2007). Defendants are sister entities that represent one of the largest corporations in the world—one that is constantly involved in litigation. Following the accident, Defendants immediately moved to preserve the evidence that they wished to use in their defense. Yet, at the same time, against their own policy, they caused the most critical piece of evidence available to Plaintiff to be spoiled. Their behavior did not change after receiving Plaintiff's Letter. Nor did they inform Plaintiff of their spoliation when Plaintiff directly inquired about it at the time of Plaintiff's initial inspection. This behavior is patently unreasonable in light of the severity of the incident and the importance of M0007. Thus, because Defendants clearly understood the significance of the evidence and fully anticipated litigation, Defendants' actions reach beyond mere negligence and rise to the level of culpability required for a bad faith finding. *See Oil Equip. Co. Inc. v. Mod. Welding Co. Inc.*, 661 F. App'x 646, 653 (11th Cir. 2016).

Be that as it may, the Court finds that dismissal in unwarranted. *See Flury*, 427 F.3d at 944. Lesser sanctions in the form of adverse jury instructions will suffice as a remedy due to the availability of ancillary evidence concerning M0007's condition. Plaintiff will be required to establish a foundation of facts demonstrating Defendant's failure to preserve M0007 in its original condition at trial before

receiving any adverse jury instructions. The specific nature of the instructions to be given will be included in the Court's conclusion.

## II.    Form 118

Because Form 118 also constitutes tangible evidence, the same spoliation framework applies such that Plaintiff must show: (1) that Form 118 once existed; (2) that Defendants had a duty to preserve Form 118; and (3) that Form 118 constitutes crucial evidence. *See Hyundai Motor Am. Corp,* 2021 WL 3111191, at *6. Defendants concede that the first two factors are satisfied but argue that Form 118 is not crucial evidence. Dkt. 122 at 10. The Court disagrees.

Form 118 was a pre-operation checklist that Defendants' drivers would complete daily before using M0007. Dkt. 84 at 27. Therein, drivers would document the functionality of M0007's brakes, lights, tires, and other parts. *Id.* at 22–23. Per Defendants' policy, this documentation would be used for approximately one month at a time before being preserved at the Distribution Center for an additional two months, thereby serving as a record for M0007's ongoing condition. *Id.* at 25. This was a paper form kept in the cab of each truck and visible in the cab. It showed, in contemporaneous fashion, important safety and maintenance status on a daily basis.

Due to a lack of other records, Form 118 was the only evidence that could conclusively provide Plaintiff with both Defendants' ongoing knowledge of M0007's condition and permissive use of M0007 in the weeks leading up to the

accident. This evidence is therefore crucial regarding Plaintiff's direct negligent entrustment claim because it would have potentially proven that Defendants had reason to know that it was not safe to entrust M0007 to Mr. Binnion (if it was so entrusted) on the day of the accident. *See Penick*, 481 F. Supp. 3d at 1293 (finding evidence crucial where it was "not the only evidence that could corroborate or refute [the plaintiff's] allegations . . . [but was] one of the main pieces of evidence that could be used to help resolve the underlying matters in . . . the case"). The importance of this evidence is only compounded by Defendants' spoliation of M0007 itself.

As with Defendant's failure to preserve M0007, the Court finds that Defendants' spoliation of Form 118 is predicated on bad faith. Defendants' own policy dictates that Form 118 should have been preserved for at least two months following the accident. Less than one month after the accident, Defendants received Plaintiff's Letter which specifically asked that "[c]opies of the complete maintenance, inspection and repair records or work orders on the vehicles involved in [Plaintiff's] accident for the day of the [accident] and the [six] months prior" be preserved. Dkt. 100 at 2–5. Yet, Defendants recklessly disregarded their obligation to preserve Form 118 in violation of their own policy and either lost or destroyed it. Once again, Defendants claim that they "[do] not know why it was discarded." Dkt. 122 at 11. This does not change the fact that, in clear anticipation of litigation,

Defendants have shown an utter disregard for the preservation of evidence that they themselves recognize to be material in the eyes of Plaintiff. This repeated disregard cannot be explained by mere negligence. Defendants are highly sophisticated entities that know better than to spoliate the two most crucial pieces of evidence at Plaintiff's disposal. Moreover, by "shirk[ing] [their] legal duty to preserve" evidence, Defendants have caused substantial prejudice to Plaintiff. *Hyundai Motor Am. Corp,* 2021 WL 3111191, at *10 (citations and internal quotations omitted).

Sanctions are therefore warranted. Once again, however, the Court finds that dismissal is inappropriate. Adverse jury instructions are sufficient to redress Plaintiff's loss where other evidence, albeit evidence of a less conclusive nature, can speak to Defendants' knowledge of M0007 and Defendants' willingness to let its employees use M0007 in its allegedly defective condition. Similarly, Plaintiff will be required to establish a foundation of facts demonstrating Defendant's failure to preserve Form 118 at trial before receiving any adverse jury instructions.

### III.   The Surveillance Video

A surveillance video constitutes electronically stored information. *See Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2018 WL 6335178, at *10–14 (S.D. Fla. Dec. 4, 2018) (discussing various court's findings that conclude that video surveillance footage constitutes electronically stored information for the purposes of Rule 37(e)). It follows that Rule 37(e) guides the Court's remaining spoliation analysis.

Thereunder, the first issue to consider is whether the allegedly spoliated video evidence should have been preserved. Fed. R. Civ. P. 37(e).

As other courts have explained, "Rule 37(e) does not set forth a standard for preservation and does not alter existing federal law as to whether evidence should have been preserved or when the duty to preserve attaches." *Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, No. 14-CV-62216, 2016 WL 1105297, at *4 (S.D. Fla. Mar. 22, 2016). Accordingly, "the test is whether litigation was pending or reasonably foreseeable when the spoliation occurred." *Id.* (quoting *Graff*, 310 F. App'x at 301). Here, as evidenced by Defendants' actions on the day of the accident, litigation was more than reasonably foreseeable. It was foreseen.

Defendants argue that they did not have a duty to preserve their surveillance video because there was no footage of the subject incident or the immediate surrounding area. But this contention is undercut by two pieces of evidence in the record. First, Plaintiff's Letter requested that Defendants' preserve "[a]ny and all videos, surveillance tapes and backup tapes located on the premises the vehicles involved or the area where the accident/incident occurred." Dkt. 100 at 2–5. It is clear from this language that Plaintiff wanted the footage regardless of whether it included video of the specific incident or incident area. Second, while Mr. Smith did testify that "[a viewer] couldn't see anything in the [incident area]," he also testified that, if he reviewed the footage more closely, "[he is] sure there would have been

video of [Mr. Binnion] traveling around the yard." Dkt. 85 at 53–54. Defendants therefore mischaracterize the situation when they claim that they "cannot preserve surveillance video that did not exist in the first place." Dkt. 122 at 7. Of course, this is true. It is no less true, however, that there was video evidence that fit Plaintiff's preservation request. And Defendants' employee testified to copying this tape onto a DVD and sending it to Defendants' trial counsel. Dkt. 85 at 53. That video is now lost or destroyed. Either way, Defendants had a duty to preserve it.

The next issue to consider is whether the video footage was lost due to Defendants' failure to take reasonable steps to preserve it. Fed. R. Civ. P. 37(e). This is assuredly the case. According to Mr. Smith, the general manager of the Distribution Center, Defendants' counsel was in possession of a DVD that contained footage requested by Plaintiff after the DVD had been created and provided to Defendants' counsel by request. Dkt. 85 at 53. This is not a situation where an auto-delete software program discarded old emails before anyone could stop it in anticipation of litigation. Similarly, this is not a situation where text messages were mistakenly deleted by an unsophisticated litigant merely carrying out his or her normal routine. *See Living Color Enters.*, 2016 WL 1105297, at *6.
However it happened, Defendants lost or otherwise discarded a DVD containing the only copy of the premises tape that was important enough for Defendants' employee to copy and provide to Defendants' lawyers (or claim to have done so). Any

preventative measure would have achieved preservation in these circumstances. The tape of the "yard" at the time of the accident, which would have shown Mr. Binnion's movements near the time of the accident, is gone forever.

The final preliminary issue to consider is whether the footage can be restored or replaced through additional discovery. Fed. R. Civ. P. 37(e). Based on counsel's representations, there is no indication that it can be. The footage is permanently lost.

With these preliminary findings made, the Court now turns to the determinative issues of whether Plaintiff was prejudiced and whether Defendants acted with an intent to deprive Plaintiff of the video's use in the instant case. If Plaintiff was prejudiced but Defendant did not intend to deprive Plaintiff of the footage, Rule 37(e)(1) applies. If Defendants intended to deprive Plaintiff of the footage, Rule 37(e)(2) applies regardless of whether the Court finds prejudice independently. Fed. R. Civ. P. 37(e) Advisory Committee's Notes to 2015 Amendment.

The Court cannot conclusively determine whether Plaintiff was prejudiced by the loss of the aforementioned video footage. Unfortunately, Defendants are the only ones that know what the footage contained in detail. The footage, moreover, could be helpful to either side. If, as the Distribution Center's general manager Mr. Smith testified, the video contained footage of Mr. Binnion traveling around the yard of the Distribution Center, it would also likely contain video of Mr. Binnion backing

into one or more of the Distribution Center's other bays. On one hand, this could give Plaintiff the direct evidence he needs to rebut Defendants' expert study, which Plaintiff claims underestimates the backing speed of Mr. Binnion and mischaracterizes Mr. Binnion's backing approach. On the other hand, such footage could validate the underlying assumptions and test conditions of Defendants' expert study. Of course, if the latter was true, Defendants' actions would be somewhat inexplicable, thereby suggesting, at the very least, that the footage would not be useful for Defendants' case. But such an inference assumes that Mr. Binnion was indeed caught on footage backing into Distribution Center bays. This much is unclear. As a result, the Court cannot make a finding of prejudice.

Intent is a closer question. As mentioned above, according to the general manager of the Distribution Center, the subject electronically stored information was lost after it had already made its way into the hands of Defendants' counsel in the form of a DVD. Defendants' now claim that this employee testified erroneously— this DVD was never provided. Whether it was a decision to discard the alleged DVD, an oversight to lose it, or an oversight in failing to preserve the footage in the first place, however, this loss constitutes gross negligence in light of the seriousness of the events of May 30, 2019.

Notwithstanding, the Court is hesitant to make a finding of intent where multiple factual questions of import are left unanswered. The Court does not know

when the DVD was lost or discarded (if it existed) or what the DVD contained to aid either side. The Court only knows that the DVD no longer exists despite Plaintiff's Letter requesting its preservation and that Defendants' employee either provided it to Defendant's lawyer or testified falsely that he did.

It is important to note here that the bifurcation of Rule 37(e) into subsections (e)(1) and (e)(2) creates a superordinate distinction between gross negligence and intent. Indeed, Rule 37(e) is largely aimed at forcing a careful differentiation between the two in order to effectuate a fair trial:

> Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. Negligent or even grossly negligent behavior does not logically support that inference. Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have. The better rule for the negligent or grossly negligent loss of electronically stored information is to preserve a broad range of measures to cure prejudice caused by its loss, but to limit the most severe measures to instances of intentional loss or destruction.

Fed. R. Civ. P. 37(e) Advisory Committee's Notes to 2015 Amendment.

That being so, because the Court considers the factual background of this case and the loss of the DVD in particular to be determinative, the Court finds that this significant intent finding should be made by the jury. Under these circumstances, "the court's instruction should make clear that the jury may infer from the loss of

the information that it was unfavorable to the party that lost it only if the jury first finds that the party acted with the intent to deprive another party of the information's use[.]" *Id.* Further, "[i]f the jury does not make this finding, [the instructions must specify that the jury] may not infer from the loss that the information was unfavorable to the party that lost it." *Id.*

## CONCLUSION

Given the foregoing analysis, the Court finds that adverse jury instructions are the most appropriate means of remedying the prejudice caused by Defendants' spoliation. As explained above, Plaintiff will be required to establish a foundation of facts demonstrating Defendant's spoliation before receiving any adverse jury instructions. In addition, the Court finds that Defendants shall pay Plaintiff for the time and resources expended by Plaintiff in bringing these spoliation issues before the Court and otherwise addressing them, including the reinspection of M0007.

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) Plaintiff's Motion for Sanctions (Dkt. 78) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

(2) The Court awards Plaintiff attorneys' fees and costs for the time and resources spent bringing this motion and re-inspecting M0007 after learning of Defendant's spoliation.

(3) Depending upon how the evidence develops, the jury instructions

(contingent on Plaintiff's ability to lay a foundation) may include a permissive presumption that M0007's original condition constituted unfavorable evidence to Defendants.

(4) Depending upon how the evidence develops, the jury instructions (contingent on Plaintiff's ability to lay a foundation) may include a permissive presumption that Form 118 constituted unfavorable evidence to Defendants.

(5) Depending upon how the evidence develops, the jury instructions (contingent on Plaintiff's ability to lay a foundation) will permit the jury to presume that the lost video footage constituted unfavorable evidence to Defendants subject to the jury first finding that Defendants acted with an intent to deprive Plaintiff of the footages' use in this litigation.

**DONE AND ORDERED** at Tampa, Florida, on January 25, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record